STATE EMPLOYMENT RELATIONS BOARD, Appellee,

v.

OHIO DEPARTMENT OF YOUTH SERVICES, Appellant.

[Cite as *State Emp. Relations Bd. v. Ohio Dept. of Youth Serv.* (1997), 122 Ohio App.3d 317.]

Court of Appeals of Ohio,
Tenth District, Franklin County.

No. 96APE10–1409.

Decided Aug. 7, 1997.

**318**

 

*Betty D. Montgomery,* Attorney General, and *Michael D. Allen,* Assistant Attorney General, for appellee State Employment Relations Board.

*Betty D. Montgomery,* Attorney General, and *Jack W. Decker,* Assistant Attorney General, for appellant Ohio Department of Youth Services.

DESHLER, Judge.

This is an appeal by defendant, Ohio Department of Youth Services ("DYS"), from a judgment of the Franklin County Court of Common Pleas, affirming an order of the State Employment Relations Board ("SERB"), finding that DYS committed an unfair labor practice in violation of R.C. 4117.11(A)(1) and (A)(5) by refusing to bargain with an employee organization over schedule changes involving employees at two separate DYS facilities.

The following stipulations were entered into between the parties during administrative proceedings before a SERB hearing officer. DYS is a department of the state organized pursuant to R.C. Chapter 5139. The agency is responsible for the care, treatment, training, supervision, and rehabilitation of delinquent youth pursuant to R.C. Chapter 2151. DYS operates several institutions for the custodial treatment of delinquent youth, including the Mohican Youth Center ("Mohican") in Loudonville, Ohio. DYS also provides aftercare services for delinquent youth who have been released from its custodial facilities but remain in its custody. One of the facilities operated by DYS for such purpose is the Northwest Regional Office ("Northwest Office") in Lucas, County, Ohio. DYS is a "public employer" within the meaning of R.C. 4117.01(B) and is represented in collective bargaining matters by the Office of Collective Bargaining ("OCB").

District 1199, Health Care and Social Service Union, SEIU, AFL–CIO ("District 1199") is an "employee organization" within the meaning of R.C. 4117.01(D), and has been certified as the exclusive representative of a bargaining unit composed of certain public employees of the state, including employees in the classification of Social Worker II. DYS employs Social Worker II employees at both Mohican and the Northwest Office. OCB and District 1199 negotiated a collective bargaining agreement, effective from June 1, 1994 through May 31, 1997, governing the terms and conditions of employment of public employees of the state in bargaining units represented by District 1199, including Social Worker II employees.

On November 23, 1994, District 1199 filed an unfair labor practice charge, alleging that DYS had unilaterally changed the working hours of Social Worker II employees, thereby refusing to bargain collectively in violation of R.C. 4117.11(A)(1) and (A)(5). The matter was assigned to a SERB hearing officer and a hearing was conducted beginning on October 27, 1995.

By order issued on February 22, 1996, SERB made the following factual findings regarding evidence adduced at the hearing before the SERB hearing officer:

"Following certain incidents of disruptive behavior of ODYS youths in AA meetings, the AA Association asked ODYS for help. An agreement was reached to treat the ODYS youth at separate AA meetings to be conducted at ODYS' Northwest Office. The AA meetings were moved 'in-house' in approximately May 1994. ODYS determined, based upon the number of youths who needed treatment, that two Social Worker IIs, one Substance Abuse Specialist, and one supervisor were necessary at each meeting. Initially, ODYS management solicited Social Worker IIs to volunteer to staff the AA meetings, which were conducted from 5:30 p.m.–6:30 p.m. on Wednesdays. Interest in volunteering eventually waned, and Social Worker IIs did not volunteer in sufficient numbers to staff the AA meetings.

"On or about September 27, 1994, ODYS, through a supervisor of the Social Worker IIs employed at the Northwest Office, issued a memorandum with a new schedule attached, mandating that Social Worker IIs flex their schedules to cover the Wednesday evening AA meetings on a rotating basis. For many years, the Social Worker IIs at the Northwest Office worked a straight 8:00 a.m.–5:00 p.m. schedule. The 1994–97 Agreement allowed employees to initiate flex-time in their schedules. However, the September 27, 1994 memorandum was the first time that ODYS changed employees' schedules by flexing their schedules.

"At Mohican, ODYS also changed the work schedules of Social Worker II's for greater accessibility to youth. On or about September 15, 1994, a schedule was issued, effective October 2, 1994, requiring the Social Worker IIs at Mohican to extend the evening hours on certain weekdays to 8:00 p.m. After this change, Social Worker IIs worked a swing-shift, with two eight-hour weekdays, two nine-hour weekdays, and a six-hour weekend day. The change in scheduling at Mohican was first announced to bargaining unit employees at a meeting called by the unit administrator sometime during the beginning of September 1994. There was no bargaining with District 1199 either before or after the change."

On December 18, 1995, the SERB hearing officer issued a proposed order, finding that DYS had made a material change in the hours of employment, that such change involved a mandatory subject of bargaining, and thus that DYS had failed to bargain in violation of R.C. 4117.11(A)(1) and (A)(5). On January 8,

1996, DYS filed objections to the hearing officer's order. On February 22, 1996, SERB issued an order, adopting the findings of fact and conclusions of law in the hearing examiner's proposed order and ordering DYS to cease and desist from refusing to bargain collectively with the representative of its employees by unilaterally changing scheduled hours of work of Social Worker II employees.

On May 9, 1996, DYS filed a notice of appeal with the trial court from the order of SERB. On September 18, 1996, the trial court rendered a decision affirming SERB's order. The decision of the trial court stated in part:

"After a review of the record of proceedings and the findings of SERB, the Court finds that there is support for the SERB Order and Opinion. While SERB could have determined that the issue of scheduling hours was not an issue requiring bargaining, or that the arguments of waiver or requirement for process through the grievance procedures were meritorious, the application of the act and the interpretation of its provisions is more properly grounded in the expertise of SERB, than this Court. The findings and conclusions by SERB were supported by reliable, probative and substantial evidence and in accordance with law."

The decision of the trial court was journalized by judgment entry filed October 25, 1996. On appeal, DYS sets forth the following assignments of error for review:

"Assignment of Error No. 1:

"The common pleas court erred in finding that it was required to give deference to SERB'S interpretation of the parties' collective bargaining agreement.

"Assignment of Error No. 2:

"The common pleas court erred in failing to find that the collective bargaining agreement covered the matter of employer-initiated schedule changes for operational reasons.

"Assignment of Error No. 3:

"The common pleas court erred in failing to find that because the collective bargaining agreement covered the matter, a failure to bargain claim was a statutory impossibility."

The first two assignments of error raised by DYS are interrelated and will be discussed together. Under these assignments of error, DYS argues that the trial court erred in deferring to SERB's interpretation of the collective bargaining agreement and in failing to find that the issue of employer-initiated schedule changes was covered under the agreement.

In *State Emp. Relations Bd. v. Adena Local School Dist. Bd. of Edn.* (1993), 66 Ohio St.3d 485, 613 N.E.2d 605, the Ohio Supreme Court noted the applicable standards of review for a trial court and appellate court in reviewing a SERB order regarding an unfair labor practice charge. Specifically, the court stated:

"In *Lorain City Bd. of Edn v. State Emp. Relations Bd.* (1988), 40 Ohio St.3d 257, 259–261, 533 N.E.2d 264, 266–267 * * *, this court explained that different standards of review are to be applied by a common pleas court and by a court of appeals when reviewing an order of SERB in a ULP case. When a common pleas court reviews a SERB order, the court must determine whether the order is supported by substantial evidence in the record. The standard of review for a common pleas court is supplied by R.C. 4117.13(D), which provides that '[t]he findings of the board [SERB] as to the facts, if supported by substantial evidence, on the record as a whole, are conclusive.' See *Lorain City Bd. of Edn., supra,* at 259, 533 N.E.2d at 266 * * *.

"An appellate court, on the other hand, plays a more limited role than a trial court in reviewing the same SERB order. The role of the appellate court is to determine whether the trial court has abused its discretion. The appellate court must affirm the judgment of the trial court if no abuse of discretion occurred. *Id.,* 40 Ohio St.3d at 260–261, 533 N.E.2d at 267 * * *." *Id.,* 66 Ohio St.3d at 491–492, 613 N.E.2d at 610–611.

As noted under the facts, SERB determined in the instant case that DYS engaged in an unfair labor practice in violation of R.C. 4117.11(A)(1) and (A)(5). R.C. 4117.11 provides:

"(A) It is an unfair labor practice for a public employer, its agents, or representatives to:

"(1) Interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in Chapter 4117. of the Revised Code or an employee organization in the selection of its representative for the purposes of collective bargaining or the adjustment of grievances;

" * * * *

"(5) Refuse to bargain collectively with the representative of his employees recognized as the exclusive representative or certified pursuant to Chapter 4117. of the Revised Code."

R.C. 4117.08(A) states that "[a]ll matters pertaining to wages, hours, or terms and other conditions of employment and the continuation, modification, or deletion of an existing provision of a collective bargaining agreement are subject to collective bargaining between the public employer and the exclusive representative, except as otherwise specified in this section."

R.C. 4117.10 provides:

"(A) An agreement between a public employer and an exclusive representative entered into pursuant to this chapter governs the wages, hours, and terms and conditions of public employment covered by the agreement. If the agreement provides for a final and binding arbitration of grievances, public employers, employees, and employee organizations are subject solely to that grievance procedure and the state personnel board of review or civil service commissions have no jurisdiction to receive and determine any appeals relating to matters that were the subject of a final and binding grievance procedure. Where no agreement exists or where an agreement makes no specification about a matter, the public employer and public employees are subject to all applicable state or local laws or ordinances pertaining to the wages, hours, and terms and conditions of employment for public employees."

At issue in this appeal is whether DYS was required to bargain prior to implementing schedule changes, under which Schedule II workers were required to be available during hours when Alcoholics Anonymous ("AA") meetings were held as part of a substance abuse treatment program for youth at the respective facilities. The facts as set forth in SERB's order indicate that employees at the Northwest Office, who historically worked a straight 8:00 a.m to 5:00 p.m. schedule, were required on a rotating basis to work until 6:30 p.m. on Wednesdays to accommodate the AA program, while workers at the Mohican facility, who worked more flexible schedules, were required to extend evening hours on certain weekdays to 8:00 p.m.[1]

In the present case, the major contention of DYS before SERB was that there was no failure to bargain by DYS because the duty to bargain was satisfied through the formation of the collective bargaining agreement. DYS relied upon the "management rights" clause under Article 5 of the agreement, as well as Sections 24.11 and 24.13 of the agreement, in support of its position that the scheduling of work hours was an issue which was previously bargained for under the terms of the contract.

In its order finding that DYS engaged in an unfair labor practice, SERB initially determined, based upon its analysis of a balancing test set forth in a prior SERB decision (*SERB v. Youngstown City School Dist. Bd. of Edn.* [June 30, 1995], SERB No. 95–010), that the issue of scheduling in the instant case involved a mandatory subject of bargaining. SERB further rejected the argument of DYS that the issue of scheduling was covered under the collective bargaining agree-

---

1. As noted above, work schedules for employees at the Mohican facility involved more flexible hours than a traditional straight schedule. A copy of the work schedule for that facility indicates that, prior to the changes implemented by DYS to accommodate the AA program, a typical schedule for a Social Worker II employee included working two nights a week until 7:30 p.m.

ment. Specifically, SERB's analysis focused upon Section 24.11 of the collective bargaining agreement. Section 24.11 states in part:

"The present practice of flex time shall be continued. * * * Flexible work schedules can include adjusting the starting and quitting times of the work days and/or the number of hours worked per day and the number of days worked per week.

"The Employer agrees to consider flexible work schedules for particular employees or classifications. The Employer agrees to consider such options as four (4) ten (10) hour days, twelve (12) hour shifts, and/or other creative scheduling patterns that may assist in the recruitment and/or retention of nurses and other employees. Subject to the Employer's right to schedule employees to satisfy its operational needs, such a schedule will be implemented upon the request of the Union and affected employees."

In interpreting the above section of the collective bargaining agreement, SERB rejected DYS's argument that the agreement covered the subject at issue, holding:

"The Respondent's argument is not persuasive. Flex-time is discussed in Section 24.11 of the 1994–97 Agreement. However, Section 24.11 merely gives the employer the right to turn down an employee's flex-time request. It is silent to the employer's right to mandate flex-time. Consequently, it appears the parties have only bargained one side of the flex-time issue, the employee's right to seek it, but not the other side of the issue, the employer's right to require employees to use flex-time. Thus, Section 24.11 cannot reasonably be read to confer upon the employer a previously bargained-for unfettered right to unilaterally alter work schedules."

Thus, SERB determined that the actions of DYS, by assigning employees to work hours during which the AA meetings were conducted, constituted the imposition of mandated flex scheduling upon Social Worker II employees. SERB further concluded that Section 24.11 of the collective bargaining agreement did not confer upon the employer the right to require employees to use flex-time for scheduling concerns, and thus viewed that provision of the collective bargaining agreement as a limitation on the ability of the employer to change the scheduling of its employees. Upon review, we find that SERB's decision is not in accordance with law.

Although a reviewing court must accord due deference to SERB's interpretation of R.C. Chapter 4117, "[s]uch deference * * * is not afforded to SERB's interpretation of a collective bargaining agreement." *Lakewood v. State Emp. Relations Bd.* (1990), 66 Ohio App.3d 387, 390, 584 N.E.2d 70, 71. Rather, "[d]eference is extended only to factual findings of an administrative agency on matters concerning the intent of contracting parties. * * * It is the ultimate

legal conclusion attached to the words and conduct of the parties that is subject to review by the court." *Id.* at 391, 584 N.E.2d at 72.

DYS argues before this court, as it did before SERB, that the collective bargaining agreement authorized DYS to change the schedule of its employees without first bargaining with the union. Federal courts have noted that, in cases in which an employer asserts a right to act pursuant to a collective bargaining agreement, "the issue upon which the alleged unfair practice rises or falls is *the meaning of the language of the agreement.*" (Emphasis *sic.*) *Internal Revenue Serv. v. Fed. Labor Relations Auth.* (D.C.Cir.1992), 963 F.2d 429, 435. If the employer's interpretation is correct, "there has been no unfair labor practice because the agreement authorized the disputed agency action." *Id.*

Article 5 of the collective bargaining agreement .at issue, "Management Rights," provides:

"Except to the extent modified by this Agreement, the Employer. reserves, exclusively, all of the inherent rights and authority to manage and operate its facilities and programs. The exclusive rights and authority of management include specifically, but are not limited to, the rights expressed in Section 4117.08(C)(1)-(9) of the Ohio Revised Code, and the determination of the location and number of facilities; the determination and management of its facilities, equipment, operations, programs and services; the determination and promulgation of the standards of quality and work performance to be maintained; the determination of the management organization, including selection, retention and promotion to positions not within the scope of this Agreement; the determination of the need and use of contractual services; and the ability to take all necessary and specific actions during emergency operational situations. Management will not discriminate against any employee in the exercise of these rights or for the purpose of invalidating any contract provision."

As set forth in the above clause, in addition to the employer's express reservation of authority to manage and operate its programs, Article 5 also provides that the rights and authority of management include those rights expressed in R.C. 4117.08(C)(1) through (9). R.C. 4117.08(C)(5) provides in part that "[u]nless a public employer agrees otherwise in a collective bargaining agreement, nothing in Chapter 4117. of the Revised Code impairs the right and responsibility of each public employer to * * * assign, schedule * * * employees."

As previously noted, SERB construed Section 24.11 of the agreement as conferring a right on the part of the employee to request flex-time scheduling, while further finding that Section 24.11 was silent as to the right of the employer to mandate that the employee work a flex schedule. While holding that the actions of DYS constituted the imposition of flex scheduling and that Section 24.11 prohibited such conduct, SERB failed to consider any other provisions of

the collective bargaining agreement, including the authority granted to DYS under Article 5. The practical effect of SERB's determination is that any assignment of hours initiated by the employer, regardless of whether such scheduling is done to meet operational needs, is subject to the bargaining process because, presumably, such conduct constitutes the unilateral change of hours regarding an existing flex schedule, a matter not covered under the parties' agreement. We disagree, however, with SERB's interpretation of the collective bargaining agreement as well as its determination that the assignment of hours necessarily implicates a flex-time issue.

Initially, we find that the facts of this case, under which DYS scheduled workers to be available during hours when AA meetings were conducted, involve merely an assignment of hours by management to cover a program operation, and that such action by the employer does not have the effect of mandating "flex-time scheduling of its employees' work hours" as determined by SERB. Instead, we view the issue as whether, under the terms of the collective bargaining agreement, the employer was authorized to schedule employees to work hours other than those set forth under an existing work schedule in order to meet operational needs.[2]

In construing the language of the agreement at issue, we find that the right of management to assign and schedule the work hours of its employees was within the terms of the contract. The "management rights" provision of the agreement is a broadly worded clause, which specifically reserves to the employer "all of the inherent rights and authority to manage and operate its facilities and programs." Further, that clause reserves to management the rights contained in R.C. 4117.08(C), including the right under R.C. 4117.08(C)(5) to "assign" or "schedule" employees. It has been held that "[t]he right 'to assign work' necessarily encompasses the right to determine when it will be performed." *United States Dept. of Justice v. Fed. Labor Relations* (C.A.5, 1984), 727 F.2d 481, 488. In the present case, management determined that scheduling workers to be available at certain hours was necessary to meet the needs of the agency's substance abuse treatment plan. This decision, involving a reassignment of work hours for operational purposes, was within the rights reserved to the employer under the collective bargaining agreement.

We note that, while we disagree with SERB's determination regarding the significance of Section 24.11 to the facts of this case, that section specifically

---

2. The evidence indicated that part of DYS's mission is to provide substance abuse treatment for the youth entrusted to the agency. SERB acknowledged that "[t]he record is clear that a part of ODYS' mission is to provide substance abuse treatment"; however, SERB further concluded, under its "balancing test" analysis, that DYS had "failed to establish that substance-abuse treatment of youth required it to mandate flex-time scheduling of its employees' work hours."

provides that the employee's ability to request the implementation of a flexible work·schedule is "[s]ubject to the Employer's right to schedule employees to satisfy its operational needs." Thus, even assuming that the actions of management implicated a flex scheduling issue, the ability of employees to request an adjustment in the starting and quitting times of their work days under the agreement is subject to management's right to satisfy operational needs. We note that nothing in the agreement itself guarantees any set arrival or departure times for employees who request flexible scheduling and there was no finding that DYS violated the terms of the agreement by implementing the scheduling changes to avoid the payment of overtime.[3] Further, we agree with the agency's contention that there is no conflict presented by language in the agreement permitting an employee to request a flexible schedule subject to management's right to require scheduling changes when operational needs are at issue.

Based upon the foregoing, we conclude that the terms of the collective bargaining agreement reserved for DYS the right to reassign the work schedule of its employees to meet the agency's operational need of providing drug treatment services to the youth at its facilities. Accordingly, DYS did not engage in an unfair labor practice by failing to bargain with the union over the scheduling or assignment of Social Worker II employees in this case. Thus we find that the trial court abused its discretion in affirming the order of SERB. The first and second assignments of error of DYS are sustained.

In light of our disposition of the first two assignments of error, the issue raised by DYS under the third assignment of error is rendered moot.

The first and second assignments of error of DYS are sustained, the third assignment of error is rendered moot, the judgment of the trial court is reversed, and this matter is remanded to the trial court with instructions to vacate the order of SERB.

*Judgment reversed*
*and cause remanded.*

BOWMAN and CLOSE, JJ., concur.

---

3. Section 24.13, "Posting of Work Schedules," states:

"Where appropriate in institutional settings, a four-week schedule shall be posted two (2) weeks in advance. An employee shall not be required to change his/her posted schedule to avoid the payment of overtime.

"Employees may voluntarily switch work days with other employees with the prior approval of the supervisor.

"In non-institutional settings where the work schedule is fixed, the agency shall not change an employee's schedule to avoid the payment of overtime."